# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | |
| ) | CR 12-18E |
| JOSEPH L. OLLIE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## OPINION

Pending before the Court is Defendant Joseph Lee Ollie's Motion to Suppress Eyewitness Identification [ECF No. 35] ("Motion to Suppress"). By way of the Motion to Suppress, Mr. Ollie seeks to suppress the identification of Mr. Ollie made by Eugene Hart Jr. ("Mr. Hart") at a February 16, 2012 state court preliminary hearing and to prevent Mr. Hart from making an in-court identification of Mr. Ollie at trial. Motion to Suppress, p. 1. The preliminary hearing was related to Mr. Ollie being charged with, among other crimes, burglary and theft, as a result of his allegedly entering the house owned by Mr. Hart on November 25, 2011 and stealing a gun. In particular, the defense argues that the identification of Mr. Ollie by Mr. Hart at the preliminary hearing was unnecessarily suggestive and creates a substantial risk of misidentification such that his due process rights will be violated if Mr. Hart is permitted to so testify. Defendant's Motion, p. 4. The United States counters that the identification should not be suppressed: "[t]he victim's identification . . .was not the product of improper circumstances created by law enforcement, and in any event, possesses sufficient aspects of reliability, which is the linchpin in determining the admissibility of identification testimony." Government's Response, pp. 1-2.

We held a hearing on the Motion to Suppress on December 5, 2012. For the reasons set forth below, Defendant's Motion to Suppress shall be denied.

## I. Underlying facts.

A. The February 16, 2012 state court preliminary hearing.

A copy of the transcript from the February 16, 2012 state court preliminary hearing was introduced into evidence and contains the following relevant information. Pennsylvania State Trooper James Brown ("Trooper Brown"), who as of December 5, 2012, had been a state trooper for eighteen (18) years, represented the Commonwealth of Pennsylvania at the hearing and questioned all of the witnesses.

Ms. Stephanie Carniewski ("Ms. Carniewski"), who lived at, and was in the Hart residence at the time the house was burglarized and a gun taken from the house, testified first to the following. She was sleeping in her bedroom on November 25, 2011, when her boyfriend, Mr. Hart, called her on the phone, and asked her who were the people at the house. She at first said no one was there, but then she walked out of her bedroom and saw a taller, black male wearing a dark colored hoody taking a gun from the gun cabinet. The man ran out of the house, across the yard, and to the second driveway on the property where he got into a white minivan and departed. She also saw a female outside of the house; the female got into the minivan with the male. Ms. Carniewski could not identify the male.

Mr. Hart testified next. He testified to the following. He approached his house on Shadduck Road in his car to come home for lunch on November 25, 2011, and saw a black male and female walking up to his front porch. The black male had a dark colored hood up; it was probably a black hoody [sweatshirt.] He also saw a white minivan in his side yard, which they call a separate driveway. He drove past his house, called Ms. Carniewski, and asked her who were the two black people at his house. At first Ms. Carniewski told him there was no one there, but then she screamed that someone was stealing his guns. At that point he turned his car around

2

to return to his house. All this time he was still on Shadduck Road. There is a big bend in Shadduck Road, right before one gets to State Route 426, and that's where he was in his car when he saw a white minivan coming from the direction of his house. He tried to stop the van by blocking the road with his car, but it just missed his car and kept going. Mr. Hart was outside of his car when the white minivan passed him. In the minivan as it passed him were the two individuals he had just seen in his front yard; the male was driving and the female was in the front passenger seat. At that point, Mr. Hart put his car in reverse in order to follow the white minivan. He picked up the minivan on Route 426. He followed it east on Route 426 to Remington Road, then north on Remington Road to Route 20 and finally to Interstate 90 where the two cars travelled westbound until Mr. Hart saw a state trooper's car, that of Trooper Terrence Dawdy. He stopped to report what had happened to the officer.

While Mr. Hart was following the white minivan, he was able to get its license plate number, which he provided to Trooper Dawdy. He also provided Trooper Dawdy with a description of the people in the vehicle: "There was a black male between 5'10," six foot, dark complexion. The female was shorter. She was wearing a multi-colored autumn colored doo-rag on her hair. And that's when they ran to the vehicle, I mean in the house. And then I seen them again when they went around the bend, the male was driving and this time he had his hood down and I got a good view of his face and her face." Transcript, p. 22. In response to Trooper Brown's question: "Do you see that man in the courtroom today?" Mr. Hart replied: "Yes, Sir." Trooper Brown then asked "And can you please point him out?" Mr. Hart replied "It's this guy right here" and pointed to Mr. Ollie.

3

Mr. Hart did not see anyone throw anything out of the minivan. The minivan was out of his sight while on Route 426 for about ten or fifteen seconds.

Mr. Hart testified on cross-examination to the following. He had seen the man he identified (Mr. Ollie) when he was pulling up to his house; the two individuals were in the yard and "my yard is only probably like the length of this room away from my porch." Id. at 29. He was about 30 feet away from the black male when he saw him in his yard, it was 11:15 A.M., and he was certain that Mr. Ollie was the person he saw. He also testified that Mr. Ollie was with a shorter black female, that Mr. Ollie had had the hood of his sweatshirt up when he saw him in his yard, but that the hood was down when Mr. Hart saw him in the white minivan as Mr. Hart tried to stop it on Shadduck Road. Mr. Hart also stated that when he "finally got close to him on Remington Road and the whole time I could see his face in the side mirror." Id. at 31.

On redirect examination, Mr. Hart explained that when he tried to stop the white minivan at the apex in the road, "I looked right in there, you know, into the minivan, they've got pretty big windshields, and realized it was them." Id. at 32. In response to the question, "was it very close,?" Mr. Hart replied "Yes, it was real close" and "I'm inches away from his vehicle." Id. at 33. Trooper Brown then asked "Did you get a good look at him then?" Mr. Hart replied "I got a good look at him all the way from the apex of the corner all the way to where my vehicle was probably about 30 feet away from him towards my steps" and "[he got by me] just by inches." Id.

In addition to questioning the witnesses at the preliminary hearing, Trooper Brown also testified at the preliminary hearing to the following. Based upon what Mr. Hart told Trooper Dawdy, Trooper Dawdy relayed the information about the white minivan to nearby police officers, and the white minivan was stopped. The minivan was registered to Mr. Ollie, he was

4

driving the minivan, and Roxanne Roberts, an African-American female, was in the front passenger seat of the van.

The gun that had been stolen from the Hart residence was not found in the van. The weapon was found after the "chase" along Route 426, along the route the white minivan has taken after it left the Hart house "not far once you make that turn from Shadduck Road on to 426." Transcript, p. 48.

When the Hart residence, the crime scene, was processed by the Pennsylvania State Police forensic unit, they found a left-hand Velcro black glove in the second driveway where the white minivan had been parked. During the search of the white minivan in which Mr. Ollie was found, the mate to this glove, a right-hand Velcro black glove was found by the driver's side door, as was a multi-colored do-rag and a dark-hooded jacket. Also found in the front compartment of the van was a set of cotton work gloves with rubber dots on them and that when forensic tests were done on the stolen weapon, markings were found on the weapon which were made from a tiny dotted pattern material.

B. The December 5, 2012 suppression hearing.

1. Trooper Brown's testimony.

Trooper Brown was the only witness to testify at the suppression hearing we held on December 5, 2012 and testified credibly. With respect to the February 2012 state court preliminary hearing, he testified to the following. State Magisterial District Judge Scott Hammer presided over the February 16, 2011 preliminary hearing. During the preliminary hearing Mr. Ollie wore a prison jump suit and sat at the defense table with his counsel, Eric Hackwelder. In addition to the magistrate judge, Trooper Brown, and Attorney Hackwelder, two (2) male constables and a female court reporter were also present in the courtroom. Mr. Ollie was the

only person in the room in prison attire and the only African American male in the courtroom at the time of the preliminary hearing. Mr. Hart identified Mr. Ollie during the preliminary hearing as the man he saw both in his front yard and driving the white minivan. When he identified Mr. Ollie, Mr. Hart did not pause; he pointed right at Mr. Ollie.

With respect to the events that occurred on November 25, 2011, Trooper Brown testified to the following. Mr. Ollie was five (5) feet, six (6) inches tall and weighed approximately 190 pounds on November 25, 2011. When the white minivan was stopped by the police, Mr. Ollie was wearing dark clothes, but was not wearing a dark hoodie and Ms. Roberts was wearing dark clothes, but was not wearing a multi-colored hair wrap. The white minivan has a huge windshield.

On November 26, 2011, a search warrant was obtained for the police to search for and seize from the white minivan a dark jacket with hood, a multi-colored head cover or hair device (i.e. do-rag), and a black right hand glove with Velcro closure. Defendant's Exhibit A. Trooper Brown searched the van. A dark-colored hoodie sweatshirt was found situated behind the driver's seat. A multi-colored hair wrap and a black glove that matched the one found at the Hart residence where the white van had been parked were also found in the van.

The location on Shadduck Road where Mr. Hart tried to stop the minivan has a sharp apex, is located approximately 6/10 of a mile from the Hart residence, and because of the nature of the apex in the road, a vehicle must slow down as it takes the turn. Mr. Hart's stolen gun was found approximately 8/10 of a mile from the Hart residence, past the apex where Mr. Hart tried to stop to the van. Forensic evidence taken from the gun found on the side of the road revealed prints on the weapon that matched the dot pattern on the gloves found in the van.

Finally, Trooper Brown testified that between November 25, 2011 and February 16, 2012, he never tried to have Mr. Hart identify Mr. Ollie as the man he saw both in his front yard and driving the white minivan and he only spoke to Mr. Hart once, to tell him when the preliminary hearing was scheduled. Trooper Brown did not tell Mr. Hart that he would have to make an identification of Mr. Ollie. He did not conduct a photographic lineup or an in-person line up. He has never conducted an in-person lineup. Trooper Brown explained that it would have been difficult to do a photographic lineup because Mr. Ollie had not been cooperative when his photograph was taken during the booking process in that Mr. Ollie would not open his eyes and they would not have had enough photographs of older black men with their eyes closed to show Mr. Hart.

Trooper Brown also explained that he had expected that Mr. Ollie's and Ms. Robert's preliminary hearings to occur at the same time. He also expected Ms. Roberts would testify at the hearing that it was Mr. Ollie who had stolen the gun from the Hart residence and thrown it out the front passenger window of the white van as they were driving away from the house; Ms. Roberts had told this information to the police once she was in custody. Ultimately Ms. Roberts did not testify at the preliminary hearing because of health issues.

Among the reasons why Trooper Brown did not ask Mr. Hart to identify Mr. Ollie prior to the preliminary hearing was because: (1) Ms. Roberts had already told the police that Mr. Ollie was present during the crime and she was supposed to testify at the hearing and (2) Mr. Ollie was found driving the white minivan.

2. Mr. Ollie's booking photograph.

A copy of Mr. Ollie's booking photograph was introduced into evidence during the suppression hearing. In the photograph Mr. Ollie's eyes are closed.

3. November 25, 2011 Incident Report.

A copy of a November 25, 2011 Incident Report completed by Pennsylvania State Trooper Terrance Dawdy was introduced into evidence during the suppression hearing. Trooper Dawdy was the state trooper whom Mr. Hart approached as he was following the white minivan. Trooper Dawdy wrote the following in his Incident Report. Trooper Dawdy was operating radar on Interstate 90 when Mr. Hart drove up and explained to the trooper that he was following a white minivan with Pennsylvania registration plate #HRK1434 on Interstate 90 heading westbound. Mr. Hart further explained to Trooper Dawdy that the minivan contained a black male and a black female who had just been at his house and stolen some of his guns. Trooper Dawdy then radioed other state troopers in the area to look for the white minivan and began to drive on Interstate 90 westbound in an attempt to locate the van. A white 1999 Pontiac Montana minivan with Pennsylvania registration plate #HRK1434 was stopped a short time later by other police officers on state Route 20, which is located off of Interstate 90. Mr. Ollie was driving the minivan, which was registered in his name. Ms. Roberts was in the front passenger seat. They both were taken into custody.

Trooper Dawdy then went to the Hart residence at 11618 Shadduck Road and interviewed Ms. Carniewski. She told Trooper Dawdy that she had been sleeping in the downstairs bedroom when Mr. Hart called her on her cell phone and asked her what the black people were doing at the house. As Ms. Carniewski was talking to Mr. Hart on the phone, she went into the living room and saw a black male take a shotgun from the gun cabinet and run out of the house. While still talking to Mr. Hart on the cell phone, she chased the man outside. Ms. Carniewski described him as being a thin black male between 5'10 and 6' tall, with dark clothes and very dark skin, who was wearing dark colored pants and a dark colored black hoodie. She

8

did not see the other individual until she was outside. She saw them get into a white minivan and leave, heading eastbound on Shadduck Road.

Trooper Dawdy then interviewed Mr. Hart at his place of employment. Mr. Hart told Trooper Dawdy that he was going home for lunch when he saw a black male and black female, both dark skinned with dark clothing, walking up to his porch. The black male was wearing a black hoodie and Mr. Hart believed him to be approximately 5'10" to 6' tall with a thin build. The black female was wearing dark clothing and a multi-colored do- rag and was about 6 inches shorter than the male. Mr. Hart also saw a white van parked in one of his driveways, which was located about 40 yards from the house. Mr. Hart did not stop at the house, and kept driving on Shadduck Road, but called Ms. Carniewski, who was at home. His call woke her up. He asked her who the two black people at the house. She said no one was there, got up and left the bedroom, and saw the individuals taking his guns. At that point, Mr. Hart turned around and headed back to the house. He then saw the same white van that had been parked at his house approaching him. He tried to block the road, got out of the car, and saw in the van the same black male and female that he had just seen walking up to his porch. The black male was driving and the black female was in the passenger seat. Mr. Hart then got back into his car and followed the white van, getting the van's license plate number, HRK1434. Mr. Hart followed the van at a high rate of speed from Shadduck Road to State Route 426 to Remington Road to State Route 20 to Interstate 90 heading west until he saw Trooper Dawdy's vehicle. It was then that he stopped and made contact with Trooper Dawdy. Mr. Hart stated that he had gotten a good look at the individuals and that he could identify them if he saw them again.

4. November 26, 2011 Application for Search Warrant and Authorization

A copy of a November 26, 2011 Application for Search Warrant and Authorization was also introduced at the suppression hearing. The Affidavit of Probable Cause that accompanied the Application for Search Warrant and Authorization was prepared by Trooper Brown. In it Trooper Brown stated that Trooper Kirk Forsythe of the Pennsylvania State Police Forensic Unit had processed the burglary scene at the Hart residence and had located a left hand black glove with a Velcro closure "along the general path that OLLIE fled from the house to his vehicle." He further stated in the Affidavit that troopers had recovered the gun stolen from the Hart residence, a Mossberg model 500 pump action shotgun, with serial number L101367, along State Route 426, on the west side on the road, approximately 8/10 of a mile from the Hart residence, and along the route the white van had travelled.

## II. Legal Analysis.

In Perry v. New Hampshire, — U.S. ——, 132 S.Ct. 716 (2012), the United States Supreme Court recently observed that "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." Id. at 727. Ultimately, the Perry Court held "that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." Id. at 730. Thus, we must first inquire into whether the identification procedure utilized in this case was unnecessarily suggestive and arranged by law enforcement.

Here, Trooper Brown testified that he did not make any attempt to have Mr. Hart identify Mr. Ollie as the black male he saw in his yard and in the white minivan prior to the preliminary hearing when he identified Mr. Ollie, the only older African American male in the courtroom as

he sat at the defense table in a prison jumpsuit, as being that black male. Trooper Brown explained that he did not think there was any need to do so prior to the preliminary hearing given the strength of the evidence against Mr. Ollie, including Ms. Roberts' willingness to testify that Mr. Ollie stole the gun. Additionally he explained that he has never conducted an in-person lineup and that it would have been difficult to do a photographic lineup in this case because Mr. Ollie had not been cooperative when his photograph was taken during the booking process in that Mr. Ollie would not open his eyes and they would not have had enough photographs of older black men with their eyes closed to show Mr. Hart. Finally, Trooper Brown testified that he had not arranged for any of the individuals who were present at the preliminary hearing (i.e. the constables, court reporter, defense counsel, etc.) to be present at the hearing. In light of these facts, we find that the identification of Mr. Ollie by Mr. Hart was not procured under unnecessarily suggestive circumstances arranged by law enforcement.

Having so found, we need not examine whether the identification procedure utilized at the preliminary hearing gave rise to such a "substantial likelihood of misidentification" that admitting Mr. Hart's identification of Mr. Ollie would be a denial of Mr. Ollie's due process rights prior to concluding that Defendant's motion to suppress must be denied. Nevertheless, for purposes of completeness, we will assume *arguendo* that we had found that the identification of Mr. Ollie by Mr. Hart was procured under unnecessarily suggestive circumstances arranged by law enforcement and examine whether the identification procedure utilized at the preliminary hearing gave rise to such a "substantial likelihood of misidentification" that admitting Mr. Hart's identification of Mr. Ollie would be a denial of Mr. Ollie's due process rights or, alternatively, whether "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances" such that the identification evidence should be

submitted to the jury to "determine its worth." Id. at 720. In so determining, our analysis is guided by five factors identified by the United States Supreme Court in Neil v. Biggers, 409 U.S. 188 (1977), namely: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the amount of time elapsed between the crime and the confrontation. Id. at 199–200.

*1. Opportunity to view the offender at the time of the offense.* Mr. Hart testified at the preliminary hearing that he was able to observe the black male multiple times on November 25, 2012: (1) from thirty feet away when the man walking in Mr. Hart's yard approaching the house; (2) from a close distance as the white minivan slowed down and passed Mr. Hart at the apex on Shadduck Road; (3) in the side mirror a car-length distance apart while Mr. Hart followed the white minivan in his car.

*2. Degree of attention.* It is unclear what was Mr. Hart's degree of attention when he saw the two individuals in his yard. On the one hand, he called his girlfriend to find out who they were; on the other hand, he was not suspicious enough to stop his car at that point. But certainly by the time he was trying to stop the white minivan at the apex on Shadduck Road and as he followed the white van, Mr. Hart's degree of attention was high; he had been told by Ms. Carniewski that they had stolen his guns. Also in support of the conclusion that Mr. Hart's degree of attention was high is that Mr. Hart was able to provide Trooper Dawdy with the correct, complete license plate number for the white minivan.

*3. Degree of certainty.* A review of the transcript for the preliminary hearing gives no indication that Mr. Hart hesitated at all in identifying Mr. Ollie and Trooper Brown testified at the suppression hearing that when Mr. Hart identified Mr. Ollie at the preliminary hearing, he did

12

not pause; he pointed right at Mr. Ollie. Additionally, Trooper Dawdy stated in his report that Mr. Hart told Trooper Dawdy that he had gotten a good look at the individuals and that he could identify them if he saw them again.

4. *Accuracy of prior description.* Mr. Hart described the male he saw on November 25, 2011 as being an older dark-skinned black male, between 5'10" and 6' tall, with a thin build. On that date, Mr. Ollie, who is a 5'6" older dark-skinned black male, weighed 190 pounds. Therefore, the description was accurate in some, but not all, aspects.

5. *Lapse of time between offense and confrontation.* The preliminary hearing was held about two and one/half months after the incident. Such a time lapse may not be ideal, but it does not render the identification fatally unreliable. For example, the Supreme Court in Biggers upheld the reliability of an identification that took place seven months after the offense. Biggers, 409 U.S. at 199–200.

Taking all of this information into consideration, we find that under the facts of this case, the identification procedure utilized at the preliminary hearing did not give rise to such a "substantial likelihood of misidentification" that admitting Mr. Hart's identification of Mr. Ollie would be a denial of Mr. Ollie's due process rights. Perry, 132 S.Ct. at 720. In other words, "the indicia of reliability [supporting Mr. Hart's identification of Mr. Ollie] are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances." Id. Specifically, Mr. Hart observed sufficient details of Mr. Ollie's physical traits that the Court does not find it dispositive that Mr. Hart described the black male as having a thin build and standing between 5'10 and 6 feet when, in fact, Mr. Ollie is 5'6" tall and weighed 190 pounds in November, 2011. Clearly Mr. Hart was attentive once he was told by Ms. Carniewski that his guns had been stolen by individuals who were now driving towards him in a white minivan. He

told Trooper Dawdy that he got a good look at the individuals and could identify them and he was certain at the preliminary hearing. Finally, an undue amount of time had not elapsed between the crime and the identification. Therefore, Defendant's Motion to Suppress Mr. Hart's identification of Mr. Ollie at the February 16, 2012 state court preliminary hearing and to prevent Mr. Hart from making an in-court identification of Mr. Ollie at trial shall be denied; the identification evidence will be admitted and a jury will ultimately determine its worth.

## III. Conclusion.

Defendant Joseph Lee Ollie's Motion to Suppress Eyewitness Identification [ECF No. 35] shall be denied.

An appropriate Order follows.

January 4, 2013

Maurice B. Cohill, Jr.
Senior District Court Judge